## WOLFE ET AL. *v.* UNIVERSITY NATIONAL BANK

[No. 70, September Term, 1973.]

*Decided October 26, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Richard M. Cooper,* with whom were *Williams, Connolly & Califano, Edward Bennett Williams, Paul Martin Wolff,*

*Stephen W. Porter* and *Frank W. Wilson* on the brief, for appellants.

*Jerome E. Korpeck*, with whom were *Peter R. Hartogensis* and *Wheeler, Korpeck & Nadonley* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

In its simplest form, the question raised by this case is within what period of time may a depositor seek to hold his bank accountable when the bank has honored checks bearing only one signature, drawn on a two-signature account?

Because the appeal is from a summary judgment entered for the bank on the pleadings, affidavit, and depositions, on the ground that there was no genuine dispute as to any material fact and that the defendant was entitled to judgment as a matter of law, Maryland Rule 610 a 1; *White v. Friel*, 210 Md. 274, 123 A. 2d 303 (1956), the determination made by the trial court was a narrow one: that the plaintiffs' action was barred by Uniform Commercial Code (the UCC) § 4-406 (4), Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, § 4-406 (4), which the defendant had specially pleaded.

The appellant Charles R. Wolfe was one of three general partners of the co-appellant, Watkins Glen Limited Partnership (Watkins Glen). In March, 1969, Watkins Glen opened a checking account with the predecessor of University National Bank (the Bank) in Rockville, Maryland.[1]

Through December, 1969, Watkins Glen's agreement with the Bank required that checks on the Watkins Glen account be signed by any two of its then three general partners: Wolfe, Per Olof Holtze and Wolfgang H. Altmann.[2] From and after 31 December 1969, Watkins Glen's agreement

---

1. On 1 July 1970, Montgomery Bank and Trust Company was merged into University National Bank, which assumed the obligations of its predecessor. The term "the Bank" therefore refers to the predecessor prior to the date of the merger and to University National Bank thereafter.

2. Holtze was deceased at the time this action was instituted; Altmann took no part in the case.

required that checks on its account be signed by either Wolfe and Per Olof Holtze *or* Wolfe and Paul S. Waymoth.[3]

During the period 27 October 1969 through 18 September 1970, 37 checks totalling $235,012.02, each bearing only one signature, were drawn on Watkins Glen's account, and paid by the Bank. Of the 37 checks, 31 were signed by Holtze; five, by Waymoth; and one, by Wolfe. Seven of the checks, six of which were signed by Holtze, in the aggregate amount of $222,900.00, were payable to Holtze Corporation. In August, 1972, Wolfe and Watkins Glen brought suit against the Bank, their declaration sounding in contract and tort.

Although no notice had been given the Bank until March, 1972, it was stipulated that monthly statements, together with the canceled checks, had been sent during the period November, 1969 to September, 1970 to Watkins Glen's office, where they were reconciled by Waymoth's assistant, and were at all times accessible to Wolfe.

In contending that it was entitled to judgment as a matter of law, the Bank relied upon those provisions of the UCC which impose upon a customer the duty to examine statements received from a bank and report an unauthorized signature within one year from date of receipt. The provisions are found in UCC § 4-406 (1) and (4):

> "(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof."

* * *

**3.** Waymoth was Watkins Glen's bookkeeper, and was also employed by and had the authority to sign checks for Holtze Corporation.

"(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)[)] discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration."

We dealt with the effect of UCC § 4-406 (4) on an unauthorized signature in *Taylor v. Equitable Trust Co.*, 269 Md. 149, 160-61, 304 A. 2d 838, 844-45 (1973), and referred there to *Union Trust Co. v. Soble*, 192 Md. 427, 64 A. 2d 744 (1949), a pre-UCC case, which held that a depositor was precluded from asserting a claim against his bank on an unauthorized endorsement if he failed to act within a reasonable time.

The view which we take of this case, which is markedly different from that taken by the trial court, makes § 4-406 (4) only of tangential interest. As we see it, and are prepared to hold, despite the fact that we neither have been referred to, nor have we found a case in point, a single signature on a check drawn against an account on which two signatures are required is not necessarily an *unauthorized* signature.

UCC § 4-401 sets forth the circumstances under which a bank may charge its customer's account:

"(1) As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account . . . ."

Here, the Watkins Glen partnership was a "customer" of the Bank.[4] Watkins Glen's signature was comprised of two

---

4. UCC § 4-104 (1) (e) defines "customer" as "any person having an account with a bank;" UCC § 1-201 (30) defines "person" to include an organization, and UCC § 1-201 (28) defines an "organization" to include a partnership. *See In re* Humphrey, 12 UCC Rep. Serv. 986 (E.D. Tenn. 1973).

individual signatures,[5] as provided for in its contract with the Bank. Consequently, since Watkins Glen's signature did not appear on any of the 37 checks in question, the partnership cannot be held liable on them, UCC § 3-401 (1),[6] and the Bank may not properly charge them to Watkins Glen's account,[7] in the absence of circumstances which alter the usual rule.

UCC § 4-406 is inapplicable here because it is only concerned with unauthorized signatures and alterations. An "unauthorized signature," "means one made without actual, implied or apparent authority and includes a forgery," UCC § 1-201 (43). UCC § 3-407 (1) gives examples of material alterations, none of which is relevant here. The signatures of Holtze, Waymoth, and Wolfe were not forged, not made without authority, nor did they constitute an alteration of any kind.

Either Holtze's and Wolfe's signature at all times or Wolfe's signature and Waymoth's after 31 December 1969 was an *authorized* signature. The infirmity lay not in the presence of an unauthorized signature on the check, but in the absence of a second authorized signature, that of either Wolfe or Altmann prior to 31 December 1969, or that of Wolfe thereafter — a second signature which was essential, under the agreement with the Bank.[8]

It naturally follows that the motion for summary judgment should not have been granted, because the one-year period of limitations imposed by § 4-406 (4) did not

---

**5.** Such a dual signature is entirely permissible under UCC § 3-401 (2): "A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature."

**6.** UCC § 3-401 (1) provides: "No person is liable on an instrument unless his signature appears thereon." "Liability on a negotiable instrument is statutorily limited to persons whose signatures appear thereon," Jennaro v. Jennaro, 52 Wis. 2d 405, 411, 190 N.W.2d 164, 167 (1971). *See* note 4 *supra*, explaining how Watkins Glen is a "person" under the UCC.

**7.** UCC § 4-104 (1) (i) states that " *'Proper[l]y payable'* includes the availability of funds for payment at the time of decision to pay or dishonor." By its very terms this definition of "properly payable" is not an exclusive one.

**8.** As regards the one check signed only by Wolfe, the countersignature of either Holtze or Waymoth was required.

apply, and because Wolfe's claim was asserted by bringing suit in August, 1972, well within the three-year period allowed by Code (1957, 1972 Repl. Vol.) Art. 57, § 1.

We must not be understood as intimating what success, if any, Wolfe or the partnership may achieve on remand. There may well be defenses available to the Bank, never developed during the procedural stage of the controversy, which could effectively preclude recovery. Such defenses might encompass those available at common law, UCC § 1-103, if the provisions of Articles 3 and 4 of the UCC prove inapplicable. UCC § 1-103 operates "as a general adoption of common law principles to commercial transactions, where the code provisions do not apply to replace them," *Gorge Lumber Co. v. Brazier Lumber Co.*, 6 Wash. App. 327, 493 P. 2d 782, 787 (1972). *See also Chicago Roller Skate Mfg. Co. v. Sokol Mfg. Co.*, 185 Neb. 515, 517, 177 N.W.2d 25, 26 (1970) (The UCC "contemplates that it shall be supplemented by existing principles of law and equity.").

> *Judgment reversed, case remanded for further proceedings, costs to abide the result.*